1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9   CARPENTERS PENSION TRUST FUND    )  Case No. 13-cv-01063-SC
    FOR NORTHERN CALIFORNIA; and     )
10  BOARD OF TRUSTEES, CARPENTERS    )  ORDER GRANTING MOTION FOR
    PENSION TRUST FUND FOR NORTHERN  )  SUMMARY JUDGMENT
11  CALIFORNIA,                      )
                                     )
12            Plaintiffs,            )
                                     )
13       v.                          )
                                     )
14  LINDQUIST FAMILY LLC, MARK       )
    LINDQUIST, and ELSIE HELEN       )
15  LINDQUIST,                       )
                                     )
16            Defendants.            )
                                     )
17  ─────────────────────────────────

18

19   **I.   INTRODUCTION**

20        Now before the Court is the above-captioned Plaintiffs' motion

21   for summary judgment.  The motion is fully briefed[1] and appropriate

22   for determination without oral argument per Civil Local Rule 7-

23   1(b).  For the reasons set forth below, Plaintiffs' motion for

24   summary judgment is GRANTED.

25   ///

26   ///

27   ─────────────────────────

28   [1] ECF Nos. 49 ("Mot."), 65 ("Opp."), 69 ("Reply").

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

## II. **BACKGROUND**

In 2010, Plaintiff Carpenters Pension Trust Fund for Northern California (the "Pension Fund") filed suit in this Court against Defendant Mark Lindquist's company, M.A. Lindquist Co., Inc. ("M.A. Lindquist"), to collect liability owed after M.A. Lindquist withdrew from the Pension Fund.  In a separate action, the Pension Fund sought to collect the same withdrawal liability from Mark Lindquist individually.  Mot. at 2.  The Court granted summary judgment in favor of the Pension Fund in both cases: against M.A. Lindquist on February 8, 2011 and against Mark Lindquist on July 19, 2011. On November 7, 2011, the Court entered judgment against Mark Lindquist individually for a total of $1,580,337.91.

Mark Lindquist is a member of the Lindquist Family LLC ("Lindquist LLC").  The Lindquist LLC was formed as the Lindquist Family Partnership ("LFP") by Elsie Lindquist (Mark's mother) for the benefit of herself and her children after the passing of her husband in 1985.  The LFP was converted into the Lindquist LLC in 2006.  The Lindquist LLC has five members, each with a twenty percent interest: Elsie Lindquist and her four adult children (Mark Lindquist, Kurt Lindquist, Lauren Bockmiller, and Leslie Ward). Opp. at 3.

Beginning around 2002, Elsie began making personal loans to Mark.  Id. at 4.  The LFP also began making loans to Mark in August 2004, and it continued to lend him money after its conversion to the Lindquist LLC.  By December of 2006, the LFP/LLC had loaned him $316,655.  Id.  Mark made one repayment of $20,000 in March 2009. He made no other payments on either loan after January 2008.  ECF No. 67 ("Bockmiller Decl.") ¶ 7.  In December of 2010, the members

**United States District Court**
For the Northern District of California

of the Lindquist LLC asked Mark to execute two promissory notes, one in favor of the LLC for $359,702.98, and one in favor of Elsie. Neither note was accompanied by a security arrangement.  ECF No. 51-3 ("Bockmiller Depo.") at 15:9-16, 19:20-24.

On June 1, 2011, after the Court entered summary judgment against M.A. Lindquist but before it granted summary judgment against Mark, Mark executed two amended promissory notes.  Prepared by counsel retained by the family, the amended promissory notes were secured by Mark's twenty percent interest in the Lindquist LLC.  Bockmiller Depo. Ex. 42.; Bockmiller Decl. ¶ 7; Opp. at 5-6. A few weeks later, both Elsie and the Lindquist LLC filed UCC Financing Statements with the California Secretary of State to perfect their liens on Mark's interest in the Lindquist LLC.[2]  ECF No. 51 ("Kirchner Decl. I") Exs. A, B.

The Pension Fund now seeks to reach Mark's share of the Lindquist LLC in satisfaction of the judgment the Court entered against him in 2011.  Defendants Lindquist LLC and Elsie Lindquist argue that their securities on Mark's share of the Lindquist LLC are senior to the Pension Fund's judgment lien.  Therefore, Defendants argue, the Pension Fund cannot reach Mark Lindquist's share of the LLC to satisfy the judgment.  The Pension Fund brings this suit seeking declaratory relief that a principal purpose of

---

[2] Though the complaint characterizes the amendments and filings as separate transactions, they were not independent.  ECF No. 1 ("Compl.") ¶ 28.  The UCC filings sought merely to perfect the liens created by the amended promissory notes.  As discussed below, the Court finds that a principal purpose of amending the promissory notes was to evade or avoid MPPAA liability.  Consequently, the amended notes, and the security agreements they created, may be disregarded.  The filings purporting to perfect the liens created by the disregarded notes may therefore also be disregarded.

**United States District Court**
For the Northern District of California

amending the promissory notes was to evade or avoid Mark's withdrawal liability.  Consequently, the Pension Fund argues, the amendment of the promissory notes and UCC statements may be disregarded for purposes of determining and collecting Mark's withdrawal liability.  Plaintiffs move for summary judgment.

**III.   <u>LEGAL STANDARD</u>**

Entry of summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment should be granted if the evidence would require a directed verdict for the moving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251 (1986).  "A moving party without the ultimate burden of persuasion at trial -- usually, but not always, a defendant -- has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment."  <u>Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.</u>, 210 F.3d 1099, 1102 (9th Cir. 2000).

"In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  <u>Id</u>.  "In order to carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact."  <u>Id</u>.  "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  <u>Anderson</u>, 477 U.S. at 255.  However, "[t]he mere existence of a

United States District Court
For the Northern District of California

1   scintilla of evidence in support of the plaintiff's position will
2   be insufficient; there must be evidence on which the jury could
3   reasonably find for the plaintiff."  Id. at 252.

4

5   **IV.  DISCUSSION**

6       **A.   The MPPAA**

7       Under the Multiemployer Pension Plan Amendments Act of 1980
8   ("MPPAA"), 29 U.S.C. § 1381 et seq., an employer who withdraws from
9   a multiemployer pension plan is liable to the pension fund for the
10  employer's share of the plan's unfunded vested benefits.  29 U.S.C.
11  § 1381.  To prevent transactions designed to shield withdrawing
12  employers from liability, Congress included a provision that "[i]f
13  a principal purpose of any transaction is to evade or avoid
14  liability under this part, this part shall be applied (and
15  liability shall be determined and collected) without regard to such
16  transaction."  29 U.S.C. § 1392(c); see also Chicago Truck Drivers
17  v. El Paso Co., 525 F.3d 591, 596 (7th Cir. 2008).  To be
18  disregarded under Section 1392(c), a transaction must have avoiding
19  liability as one of its major purposes.  However, avoiding
20  liability need not be the primary purpose.  Santa Fe Pac. Corp. v.
21  Cent. States, Se. & Sw. Areas Pension Fund, 22 F.3d 725, 727 (7th
22  Cir. 1994) ("[W]e would be doing violence to the language and the
23  purpose of the statute if we read 'a principal' as 'the
24  principal.' . . . To let the employer off even if avoiding such
25  liability was a major purpose would ill serve the statute's
26  goal.").  The sole issue in this case is whether avoiding liability
27  under the MPPAA was a principal purpose of amending the promissory
28  notes in June 2011.

The Ninth Circuit has not articulated a test to determine whether a transaction's principal purpose was to avoid liability under the MPPAA.  Cf. Resilient Floor Covering Pension Fund v. M & M Installation, Inc., C08-5561 BZ, 2012 WL 669765 (N.D. Cal. Feb. 29, 2012).  However, the Ninth Circuit has indicated that a transaction is less likely to be disregarded under Section 1392(c) if it (1) is a "bona fide, arm's-length" transaction, and (2) does not frustrate the purposes of the MPPAA.  Cuyamaca Meats, Inc. v. San Diego & Imperial Counties Butchers' & Food Employers' Pension Trust Fund, 827 F.2d 491, 499 (9th Cir. 1987).  The Resilient Floor Court also interpreted the statute to require intent or knowledge, holding that Section 1392(c) applies only if "the employer was aware of its liability and factored that into its decision."  2012 WL 669765 at *2.  Notably, the Resilient Floor Court looked for evidence that either party, not just the employer, had the required intent.  Outside the Ninth Circuit, courts have considered additional factors including (1) the size of the withdrawal liability relative to the value of the transaction in question; (2) whether the transaction was supported by adequate consideration; and (3) the timing of the transaction.  See Teamsters Joint Council No. 83 of Va. Pension Fund v. Empire Beef Co., Inc., 3:08CV340-HEH, 2011 WL 201492 at *3-4 (E.D. Va. Jan. 20, 2011).  The Court proceeds to examine all of these factors as they apply to the present case.

**B.   The Cuyamaca Meats and Resilient Floor Factors**

Collapsing the requirements outlined in Cuyamaca Meats and Resilient Floor produces a three-factor test.  A transaction is most likely to run afoul of Section 1329(c) if it is (1) not a bona

**United States District Court**
For the Northern District of California

fide, arm's-length transaction; (2) the employer had knowledge of its withdrawal liability; and (3) one or more of the parties to the transaction intended to frustrate the purposes of the MPPAA.  The Court examines each factor in turn.

### 1.   Bona Fide Arm's-Length Transaction

The amendment of the promissory notes was not an arm's-length transaction.  It simply could not be, when the parties were all immediate family members and the only shareholders in the Lindquist LLC.  Nor do the details suggest a bona fide arm's-length transaction: Mark was simply presented with the documents and asked to sign them.  There was no negotiation between the parties or their attorneys.  Bockmiller Depo. at 59:14-61:16.  A transaction between close family members regarding membership interests in an LLC, when those family members also happen to be the only members of the LLC, with no negotiation over the terms, cannot be considered a bona fide arm's-length transaction.

Defendants do not dispute the fact that no negotiation occurred or that the parties had close familial relationships; they argue instead that Mark's existing debt and interest in the Lindquist LLC were acquired legally.  Opp. at 8.  While true, those facts do not affect the Court's analysis of this factor.  Whether a transaction is bona fide and arm's-length depends on the relationships between the parties and the bargaining process, not how the property or interest transferred through the transaction was acquired.  Here there was a close familial relationship among the parties to the transaction, and there was no bargaining at all.  Defendants also argue repeatedly that the transaction itself was legal.  Again, they may be correct, but the legality of the

**United States District Court**
For the Northern District of California

transaction does not help their case.  Section 1392(c) does not require that a transaction be illegal for it to be disregarded, only that a primary purpose be the avoidance or evasion of liability under the MPPAA.

Defendants also read Cuyamaca Meats to create a strict limitation on Section 1392(c), so that it applies only to "changes in identity, form, or control, or . . . transactions that are less than bona fide and arm's length." Opp. at 9-10.  The Court is not convinced that Defendants' reading of that case is correct. Regardless, even were such a strict limitation in place, it would not save Defendants.  As discussed above, the amendment of the notes was less than bona fide and arm's-length.  Additionally, the transaction was merely a change in form: it converted the unsecured debt into secured debt and was unsupported by any consideration.[3] The Court finds that the amendment of the promissory notes was merely a change in the form of Mark's debt, unsupported by consideration and with little or no economic substance.

### 2.   Knowledge of Withdrawal Liability

There is no doubt that the parties to the transaction were aware of Mark's withdrawal liability.  Indeed, the promissory notes were secured after M.A. Lindquist had been adjudged liable for its withdrawal from the Pension Fund.  The amendment of the promissory notes occurred in June 2011, four months after the Court had granted summary judgment against M.A. Lindquist.  Carpenters Pension Trust Fund for N. Cal. v. M.A. Lindquist Co., Inc., CIV. 10-0812-SC, 2011 WL 499947 (N.D. Cal. Feb. 8, 2011).  A similar

---

[3] A fuller discussion of the adequacy of consideration, which is one of the Empire Beef factors, follows in Section IV.C.2, below.

United States District Court
For the Northern District of California

summary judgment motion was pending against Mark individually when the amendments were executed.

Though Defendants do not argue the point, it is true that, in June of 2011, Mark was not certain that the Pension fund could reach his personal assets.  The Court granted summary judgment against M.A. Lindquist in February 2011, but it did not grant summary judgment against Mark individually until July 19, 2011, about seven weeks after the notes were amended.  Carpenters Pension Trust Fund for N. Cal. v. Lindquist, 10-3386 SC, 2011 WL 2884850 (N.D. Cal. July 19, 2011), aff'd, 491 F. App'x 830 (9th Cir. 2012). However, Mark had to be aware of the risk to his personal assets, as the litigation against him individually had been initiated in 2010, and his counsel submitted an opposition brief to the summary judgment motion on June 2, 2011.  The Court finds that Mark was aware on June 1, 2011 of the substantial risk that the Pension Fund would be able to reach his personal assets.

The other Lindquist siblings were also undoubtedly aware of his potential liability and of the possibility that Mark's share in the Lindquist LLC was at risk.  On February 10, 2011, Kurt Lindquist, Mark's brother and a member of the Lindquist LLC, discovered the entry of summary judgment against M.A. Lindquist. Kurt immediately emailed his sisters, Lauren Bockmiller and Leslie Ward, with the news.  Kurt noted in a subsequent email, sent the same day, that the Lindquist family "will now need to hire an attorney to try and protect the LFP assets."  ECF No. 51 Ex. E ("K. Lindquist Depo.") at 20:19-23:22, Ex. 6; K. Lindquist Depo. at 22:16-23:9 (clarifying that "LFP" referred to the Lindquist LLC). In her reply email, Ms. Bockmiller noted that the judgment "is

against MA Lindquist Co." and asked, "So there are more steps involved in order for them to get to him [Mark] personally, right?" K. Lindquist Depo. Ex. 6.

Despite her (correct) assumption that Mark was not immediately personally liable, Ms. Bockmiller suggested that "Maybe [Mark] can give his share of LFLLC to his children . . . right now." Id. She was concerned that, even though "more steps" would be required to reach Mark personally, his share of the Lindquist LLC might be vulnerable. These emails demonstrate that, as of February 2011, the Lindquist siblings had already realized the possibility that the Pension Fund might reach Mark's share of the Lindquist LLC. At that point, at least four of the five members of the Lindquist LLC were aware of the risk that Mark Lindquist's withdrawal liability threatened his interest in the Lindquist LLC. This factor, too, weighs in favor of finding that avoiding liability under the MPPAA was a principal purpose of the transactions.

### 3.   **Intent to Frustrate Purpose of MPPAA**

The MPPAA was designed to ensure that multiemployer pension funds would be able to continue to pay the benefits owed to employees even after an employer withdrew from the plan. It did so by requiring withdrawing employers to pay their shares of the plan's unfunded liability. See Concrete Pipe & Products of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal., 508 U.S. 602, 607-611 (1993); H.C. Elliott, Inc. v. Carpenters Pension Trust Fund for N. Cal., 859 F.2d 808, 809-12 (9th Cir. 1988). The Court's judgment in Carpenters Pension v. Lindquist rendered Mark liable for M.A. Lindquist's debt to the Pension Fund. A transaction designed to shield Mark Lindquist's assets from that judgment

United States District Court
For the Northern District of California

prevents the Pension Fund from obtaining the payment owed to it. That creates precisely the problem the MPPAA was designed to solve: a pension fund being unable to pay benefits because of an employer's withdrawal.  Therefore, if the amendment of the promissory notes was designed to prevent the Pension Fund from reaching Mark Lindquist's share of the Lindquist LLC, then that transaction was intended to frustrate the purposes of the MPPAA.

The Court notes initially that Plaintiffs rely exclusively on evidence of the intentions of Kurt Lindquist, Ms. Bockmiller, and Ms. Ward to establish the purpose of the transaction.  Plaintiffs' only evidence of Mark's intentions is a transcript from his debtor's examination, which does not mention the amendments to the notes.  This is not necessarily problematic.  Though prior decisions applying Section 1392(c) have tended to focus on the employer's intentions, there is no reason that the other parties' intentions should not determine the principal purposes of the transaction.  This is especially true where, as here, interest in the subject of the transaction is divided among the parties, and all parties to the transaction might have an incentive to shield those assets from MPPAA liability.

Within a few days of the entry of judgment against M.A. Lindquist, the Lindquist siblings were already discussing the necessity of "protecting" the Lindquist LLC from the judgment.  K. Lindquist Depo. Ex. 6.  Ms. Bockmiller suggested Mark Lindquist give his share of the LLC to his children.  Id.  Kurt noted the necessity of retaining counsel to protect the Lindquist LLC's assets.  Id.  The only possible threat against which it might have been necessary to protect the Lindquist LLC at that point was the

1   Pension Fund's judgment against M.A. Lindquist.  Shortly

2   thereafter, the family engaged McInerney & Dillon as counsel to, in

3   Ms. Bockmiller's words, "protect the interests of the Lindquist

4   Family LLC."  ECF No. 67 ("Bockmiller Decl.") ¶ 10.

5       Three months later, on May 12, Kurt sent another email to Ms.

6   Bockmiller and Ms. Ward.  At that point, the hearing for the

7   Pension's Fund summary judgment motion in its case against Mark was

8   scheduled for May 27.  Kurt wrote: "If the date for the summary

9   motion is still May 27, that give [sic] us two weeks to get our

10  shit together, make a decision and get those loan docs re-done if

11  necessary, correct?"  ECF No. 70 ("Kirchner Decl. II") Ex. A.  He

12  then went on to say, "I don't want teh [sic] unions or anyone else

13  for that matter, owning a part of our LQ property. Let's please buy

14  him [Mark] out."  Id.  About three weeks later, the loan documents

15  were indeed "redone."  Mark and the Lindquist LLC (represented by

16  Elsie) executed the amended promissory notes securing the existing

17  loans with Mark's interest in the Lindquist LLC.  Bockmiller Depo.

18  Ex. 42.

19      The Court finds that there is exactly one reasonable

20  interpretation of this evidence.  When summary judgment was entered

21  against M.A. Lindquist, the family became concerned that the

22  Pension Fund might be able to reach Mark's share of the Lindquist

23  LLC to satisfy the judgment.  The family retained counsel to

24  protect the Lindquist LLC from that possibility because, as Kurt

25  stated, they did not want the "unions or anyone else" owning a part

26  of the Lindquist LLC.  After conferring with counsel, the family

27  convinced Mark to execute the amended promissory note.  By securing

28  the existing loans with Mark's share of the Lindquist LLC, Elsie

**United States District Court**
For the Northern District of California

and the the Lindquist LLC would obtain interests in Mark's share of the Lindquist LLC senior to the Pension Fund's judgment lien.  That might prevent the Pension Fund from reaching Mark's share of the Lindquist LLC.  As discussed above, preventing the Pension Fund from satisfying its judgment frustrates the purpose of the MPPAA. Because the amendments to the promissory notes were executed to prevent the Pension Fund from reaching Mark's assets, the parties to the transaction acted with the intent to frustrate the purpose of the MPPAA.

Defendants counter that the sole purpose of the security arrangement was to ensure that the loans were repaid.  They argue that the repeated references to "protecting" the Lindquist LLC's assets meant only ensuring repayment.  Defendants do not produce any evidence at all from 2011 in support of their interpretation. Instead, they submit only the declarations of Ms. Bockmiller, Kurt Lindquist, and Elsie Lindquist, all made in May 2014 for the purposes of this litigation, that the only purposes for the security arrangement were to "assure that both sets of loans be repaid" and to "protect the interests of the Lindquist Family LLC." Bockmiller Decl. ¶ 10; see also ECF No. 66 ("E. Lindquist Decl.") ¶ 8; ECF No. 68 ("K. Lindquist Decl.") ¶ 3.  Defendants argue that those two purposes -- assuring repayment and protecting the LLC's interests -- were synonymous, and that neither refers to shielding Mark's share of the LLC from the Pension Fund.

Defendants' interpretation of these declarations simply does not square with the communications between the family members from around the time of the transaction.  If the only purpose of amending the notes was to ensure repayment of the loans, then the

**United States District Court**
For the Northern District of California

suggestion from Ms. Bockmiller that Mark give his share of the
Lindquist LLC to his children makes no sense at all.  That would
not help Mark Lindquist pay his debt; it would only make it more
difficult for the Pension Fund to reach his share.  Kurt's May 12
email removes any doubt.  The loan documents were "redone" to
prevent the Pension Fund from obtaining a share of the Lindquist
LLC.  The only reasonable interpretation of the references in the
declarations, depositions, and emails to "protecting" the Lindquist
LLC's assets is that the family meant protecting Mark's share from
the Pension Fund's judgment.  Further, Elsie testified at her
deposition that she had no concerns that Mark Lindquist would repay
the loans and did not care whether he did so during her lifetime.
ECF No. 51-7 ("E. Lindquist Depo.") 73:19-74:5.  Elsie was a
signatory of both amended promissory notes. Bockmiller Depo. Exs.
42-44.  If she was unconcerned about repayment, the only reason to
add a security arrangement would be to prevent the Pension Fund
from reaching Mark's share.

     The Court finds that the evidence Defendants present is
insufficient to create a genuine issue of material fact.  There
remains only one reasonable interpretation of the evidence: by
amending the promissory notes, the family intended to prevent the
Pension Fund from reaching Mark's share of the Lindquist LLC.  The
transaction was therefore intended to frustrate the purpose of the
MPPAA.  Not only do all three factors developed in Cuyamaca Meats
and Resilient Floor favor Plaintiffs, but the evidence presented
demonstrates unequivocally that avoiding liability under the MPPAA
was a primary purpose of amending the notes.  The Court finds that
there is no genuine issue of material fact: the amendment of the

**United States District Court**
For the Northern District of California

promissory notes, executed by Mark Lindquist and Elsie Lindquist (on behalf of herself and the Lindquist LLC), on June 1, 2011 had as a primary purpose the avoidance of liability under the MPPAA.

## C.   The Empire Beef Factors

The analysis above is sufficient to support a finding that amendment of the notes had as a primary purpose the evasion of MPPAA liability.  However, the Court proceeds to analyze the Empire Beef factors for the sake of completeness.

### 1.   Size of Withdrawal Liability

The Empire Beef Court assessed the size of the withdrawal liability relative to the size of the allegedly fraudulent transaction.  It found that Empire Beef owed $485,936.18 to the pension fund, which "pale[d] in comparison" to the approximately $12 million it owed to other creditors.  Empire Beef, 2011 WL 201492 at *3.  Because the transaction in question in that case insulated Empire Beef from all of its creditors, the court determined that potential liability to the pension fund was likely only a minor consideration.  Id.

Mark Lindquist's liability was adjudged at $1,580,337.91.  ECF No. 63, Carpenters Pension v. Lindquist, No. 10-cv-03386-SC ("M. Lindquist Judgment").  The value of the transaction is more difficult to determine.  Mark's collateral -- the only property exchanged in the transaction -- was his share of the Lindquist LLC. Defendants assert that a share of the Lindquist LLC is virtually worthless to anyone outside the family.  They further contend that surrendering Mark's interest in the Lindquist LLC to the Pension Fund will make little impact on the withdrawal liability because the LLC has never paid more than $20,000 in annual distributions to

a member.  Opp. at 12.  However, Mark has estimated the value of
his share of the LLC at "[f]ive or six hundred thousand" dollars.
ECF No. 51-9 ("M. Lindquist Transcript") 40:15-41:2.  While the
transaction in question in Empire Beef dwarfed the size of the
withdrawal liability, the opposite is true here.  Mark's liability
is about three times larger than the value of his share of the
Lindquist LLC, so the relative size of the transaction can hardly
be evidence that the withdrawal liability was only a minor
consideration.  This factor therefore favors the Pension Fund.

### 2.   Adequate Consideration

     The next factor the Empire Beef Court examined was whether the
transaction was supported by adequate consideration.  A transaction
unsupported by consideration is more likely to be designed to evade
liability because it lacks true economic substance.  In this case,
the amendment of the notes was not supported by any consideration.
Mark already owed debts to Elsie and the Lindquist LLC.  He agreed
to put up his share in the Lindquist LLC as collateral for the
loans, thereby giving something of value to his creditors.  But he
received nothing in return; none of his debt was forgiven or
canceled.  So the transaction was unsupported by any, much less
adequate, consideration.

     Defendants' response to this argument is puzzling.  They cite
a California Supreme Court case for the proposition that
"antecedent debt constitutes a valuable consideration."  Opp. at 8
(citing Smitton v. McCullough, 182 Cal. 530, 537 (Cal. 1920)).  It
is unclear exactly what Defendants mean by this.  Certainly
canceling or securing pre-existing debt constitutes valuable
consideration, but that is precisely Defendants' problem.  By

**United States District Court**
For the Northern District of California

1   supplying his share in the Lindquist LLC as security for his pre-
2   existing debt, Mark gave the Lindquist LLC good and valuable
3   consideration.  But he did not receive anything of value in return.
4   The only benefit Mark received from the transaction was that his
5   family would have a senior lien on his share of the Lindquist LLC.
6   Therefore, the Court finds that there is no genuine issue of
7   material fact as to whether Mark received adequate consideration
8   for providing a security on the loans.  This factor, too, favors
9   Plaintiffs.

10              **3.   <u>Timing of the Transaction</u>**

11         The timing of the transaction is one of the strongest points
12   in Plaintiffs' favor.  When the transaction occurred, the Court had
13   already entered summary judgment against the Lindquist LLC, and a
14   similar summary judgment motion was pending against Mark as an
15   individual.  The Lindquist siblings had already expressed concerns
16   that the judgment creditor might be able to reach Mark's assets.
17   Only a few weeks before the promissory notes were amended, Kurt
18   expressed an intent to "get the loans redone" before the entry of
19   summary judgment to prevent the Pension Fund from obtaining any
20   part of the Lindquist LLC.  Crucially, the transaction did in fact
21   occur before judgment was entered against Mark, thereby succeeding
22   in its goal of insulating his share of the Lindquist LLC from the
23   Pension Fund's judgment.  The Court finds that the context of the
24   transaction, including its timing, demonstrates unequivocally that
25   evading or avoiding MPPAA liability was a major purpose of amending
26   the promissory notes.
27   ///
28   ///

17

**V. <u>CONCLUSION</u>**

The Court finds that there is no genuine issue of material fact as to whether avoiding Mark Lindquist's MPPAA liability was a principal purpose of amending the promissory notes and filing the UCC statements.  Because that was the only disputed factual issue, Plaintiffs' motion for summary judgment is GRANTED.  As a matter of law, Elsie Lindquist and the Lindquist LLC's senior secured interests in Mark Lindquist's share of the company must be ignored for the purposes of determining and collecting Mark Lindquist's liability to the Pension Fund.


IT IS SO ORDERED.


Dated: June 10, 2014                     _____

                                         UNITED STATES DISTRICT JUDGE